# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 09-CV-977 (JFB) (ARL)

————————————

VINCENT VALENTI,

Plaintiff,

VERSUS

MASSAPEQUA UNION FREE SCHOOL DISTRICT, ET AL.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
March 28, 2012

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Vincent Valenti ("Valenti" or "plaintiff") brought this civil rights action against his employer, the Massapequa Union Free School District (the "School District") and Barbara Williams ("Williams"), a Principal employed by the School District, in her individual and official capacity (collectively, the "defendants"), alleging the following: (1) employment discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII") and Article 15 of the Executive Law of the State of New York §§ 290 and 296 (the "Human Rights Law"); (2) unlawful retaliation for engaging in activities protected by the aforementioned statutes; and (3) failure to take reasonable measures to protect plaintiff from student harassment, as well as unlawful retaliation for protected activity, in violation of constitutional rights secured by 42 U.S.C. § 1983 ("Section 1983"). Specifically, plaintiff claims that he was the subject of gender discrimination and retaliation arising from, *inter alia*, the School District's resolution of an allegation against him by a student regarding inappropriate touching of a student's shoulder, which was investigated by the School District and resolved in plaintiff's favor. Plaintiff seeks actual, compensatory and punitive damages, attorneys' fees and other costs, and equitable relief. Defendants previously moved to dismiss the complaint, and this Court dismissed the Title VII claim against Williams and the Section 1983 claim against Williams in her official capacity, but denied the motion as to the other claims. Defendants now move for summary

judgment as to the remaining causes of action.

For the reasons set forth below, the motion is granted in its entirety. In particular, the Court denied defendants' motion to dismiss the complaint because plaintiff had alleged (1) that, when a student accused him of improper behavior, the School District did not discipline the student for a false accusation, and (2) students of female teachers were properly disciplined for similar false allegations. The Court concluded that, under the liberal pleading standard, plaintiff had articulated a plausible claim for gender discrimination and retaliation. However, discovery has clearly revealed that no rational jury could find gender discrimination and/or retaliation even if all the evidence in the record is construed most favorably to plaintiff. Specifically, although plaintiff attempts to create a factual dispute about every minute detail of the case, it is uncontroverted that (1) plaintiff attended a meeting on September 27, 2007, where Williams advised plaintiff that a parent of one of plaintiff's students had stated that her daughter had felt uncomfortable when plaintiff touched her on the shoulder because the daughter sometimes had difficulty interpreting social cues; (2) the parent was explicit in noting that she did not want this to be construed as an allegation of any kind, and did not believe plaintiff had done anything wrong or improper, but wanted plaintiff to be aware of the situation; (3) Williams emphasized this point (as plaintiff concedes) by telling plaintiff, "Don't worry about it. It's all handled. The parent loves you."; and (4) Williams did not accuse plaintiff of any wrongdoing, and plaintiff concedes that he never asked that an investigation be conducted or that the student be disciplined or removed from his class. Given these uncontroverted facts, no rational jury could conclude that the handling of this situation by defendants constitutes an adverse action for purposes of gender discrimination or even under the broader definition for retaliation, nor could such a jury conclude that defendants were motivated in their actions by gender and/or an effort to retaliate. Notwithstanding his contentions to the contrary, plaintiff has cited no policy or practice that suggests that the student should have been disciplined in this situation. Moreover, there is no evidence of any similarly situated female teacher who was treated differently. In essence, plaintiff has attempted to take a workplace event resolved in his favor and transform it into a gender discrimination or retaliation claim where there is no factual basis for doing so. Similarly, plaintiff has attempted to take other mundane, workplace events and convert them to claims of discrimination. For example, plaintiff claims that being asked to submit a document by email, as opposed to paper, was discriminatory. In short, the Court has fully analyzed all of plaintiff's allegations and, even if they were all credited, no rational jury could conclude that they (either individually or collectively) constitute gender discrimination or retaliation. Plaintiff's equal protection claim under Section 1983, as well as his state law discrimination claims, cannot survive summary judgment for the same reasons. Finally, although the Court is concerned that plaintiff appears to perceive gender discrimination and/or retaliation even where there is insufficient factual or legal basis for doing so, the Court does not believe defendants are entitled to attorneys' fees under the circumstances of this case. In particular, the Court concludes that there is an insufficient basis to find that plaintiff brought and continued the lawsuit in bad faith, or that it was factually and/or legally

frivolous, or that there are any other grounds for such an award.

## I. BACKGROUND

### A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[1]

Valenti has been employed as a special education teacher in the School District since September 1984. (Defs.' 56.1 Statement ¶ 14.) The School District divides the high school into two campuses. (*Id.* ¶¶ 6-8.) The Ames Campus houses the 9th grade class (the "Ames Campus"), while the Main Campus houses 10th grade through 12th grade. (*Id.*) Williams was the Principal of Massapequa High School, Ames Campus, from 2005 to 2010, and became the Principal of Massapequa High School, Main Campus, in July 2010. (*Id.* ¶¶ 12, 13.)

---

[1] In addition, although the parties' Rule 56.1 statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 statements, rather than the underlying citation to the record, when utilizing the 56.1 statements for purposes of this summary of facts.

### 1. Valenti's Prior Actions

Plaintiff filed two complaints against the School District in 2003 and 2004, both alleging gender discrimination and unlawful retaliation. (*Id.* ¶¶ 15, 16.) Both complaints were dismissed in their entirety on September 5, 2006, when this Court granted the School District's motion for summary judgment. (*Id.* ¶ 17.) Williams was not named as a defendant in the prior actions. (*Id.* ¶¶ 18, 19, Pl.'s 56.1 Counter Statement ¶ 18, 19.)

### 2. The Meeting Regarding Student's Allegation of Inappropriate Touching

Kimberly Hession ("Hession") is a social worker at Ames Campus. (Defs.' 56.1 Statement ¶ 20.) According to the defendants, on September 26, 2007, Hession had a conversation with the parent of a child she counsels. (*Id.* ¶ 21.) The parent told Hession that her daughter felt uncomfortable when plaintiff touched her shoulder. (*Id.* ¶ 23.) The defendants contend that the parent did not want her statement to be construed as an allegation, because the parent understood that her child was hypersensitive and did not believe that there was any inappropriate touching. (*Id.* ¶¶ 22, 24, 25.) According to the defendants, Hession reported the discussion to Williams, who subsequently spoke to the parent. (*Id.* ¶¶ 26, 27.) Williams confirmed that the parent was not accusing plaintiff of any impropriety. (*Id.* ¶ 27).

The plaintiff contends that he was told that the parent approached Williams at "Back to School Night" to relay this information, and that he did not know until Hession's deposition on November 30, 2010 that the parent initially approached Hession. (Pl.'s 56.1 Counter Statement ¶¶ 21, 22.)

Furthermore, plaintiff asserts that he did not know any information about the student, including but not limited to, the hypersensitivity of the student. (*Id.* ¶ 24.)

On September 27, 2007, Williams met with plaintiff and Alex Norden, plaintiff's union representative, in William's office. (Defs.' 56.1 Statement ¶¶ 30, 31.) According to the defendants, Williams explained that the meeting was informal and that no disciplinary action would be taken. (*Id.* ¶ 34.) She relayed the information she received from the parent and did not suggest that plaintiff inappropriately touched the student. (*Id.* ¶¶ 32, 33, 34.) Defendants contend that no one at the meeting indicated that there was disciplinary action being taken, that plaintiff had done anything wrong, or that the parent was making an accusation against him. (*Id.* ¶¶ 35, 36, 37, 38, 39, 40.) Additionally, according to the defendants, no formal or informal allegation was made by the parent. (*Id.* ¶ 28.) The defendants further state that Williams did not take any disciplinary action against Valenti. (*Id.* ¶ 41.) In fact, the defendants and plaintiff agree that Williams told plaintiff, "Don't worry about it. It's all handled. The parent loves you." (*Id.* ¶ 42, Pl.'s 56.1 Counter Statement ¶ 42.)

However, plaintiff avers that the manner in which the meeting transpired, and the presence of Norden, indicated that the meeting was disciplinary and that a formal or informal allegation was made against him. (Pl.'s 56.1 Counter Statement ¶¶ 28, 29, 33, 34.) Moreover, plaintiff denies that Williams relayed certain information to him, such as that the female student was hypersensitive. (*Id.* ¶ 32.) Plaintiff also states that, although he was not subjected to any disciplinary action on the day of the meeting, and no official disciplinary action

has been taken, he has been subjected to, *inter alia*, increased supervision. (*Id.* ¶¶ 35, 36, 36, 37, 38, 39, 40, 41.)

Aside from asking for the name of the student, plaintiff did not ask for any action to be taken, including removal of the student from his class, either at the meeting or at any time after its conclusion.[2] (Defs.' 56.1 Statement ¶¶ 43, 44, 45, 46, 47.) Although plaintiff discussed the September 27 meeting with his colleagues, he asserts that because Williams, Hession, Norden and the parent of the student knew about the incident, he was unsure about the number of people who knew about the alleged touching. (Pl.'s 56.1 Counter Statement ¶ 50.)

Plaintiff never asked Norden to do anything with regard to this incident, nor did he discuss the incident with his union. (Defs.' 56.1 Statement ¶¶ 52, 53.) Plaintiff never asked Williams to take any further action with regard to the incident, he did not specifically ask that an investigation be conducted, nor did he directly ask that disciplinary action be taken against the student. (*Id.* ¶¶ 47, 55, 56.)

Plaintiff contends, however, that, regardless of his failure to make a request, the mere statement that he touched a student should have triggered a formal response by the School District. (Pl.'s 56.1 Counter Statement ¶¶ 56, 57.) Plaintiff cites to the School District's Code of Conduct (the "Code of Conduct") provision that requires the Administration to enforce the Code of Conduct and ensure that all cases are resolved promptly and fairly. (Pl.'s 56.1

---

[2] According to plaintiff, he requested the name of the student's parent at the meeting. (Pl.'s Counter 56.1 Statement ¶ 43-44.)

Statement ¶¶ 66, 67; Pl.'s Ex. 14, p. 7.) Valenti refers to the Code of Conduct section that prohibits a student from engaging in any conduct that endangers the safety, morals, health or welfare of self or others. (Pl.'s 56.1 Statement ¶ 68; Pl.'s Ex. 14, p. 11.) An example is defamation, which includes making false or unprivileged statements about an individual that harm the reputation of the person by demeaning them. (Pl.'s 56.1 Statement ¶ 69; Pl. Ex. 14, p. 11.) Valenti states that, according to the Code of Conduct, students who violate the Code are subject to disciplinary action and cites to page 10 of the Code as authority. (Pl.'s 56.1 Statement ¶ 70, Pl. Ex. 14, p. 10.) The Code of Conduct states, in relevant part, that "[s]tudents may be subject to disciplinary action, up to and including suspension from school." (Pl.'s Ex. 14, p. 10.)

Plaintiff states that two of his similarly situated female colleagues had disruptive students removed from their classes. (Pl.'s 56.1 Statement ¶¶ 80, 84.) Ellen Bashan ("Bashan"), a Special Education teacher in the District, was able to have a student who threatened and harassed her removed from her class. (*Id.* ¶¶ 80, 81.) Nancy Doherty ("Doherty") also had a student removed from her class in a prompt manner after she spoke to Williams about the student. (*Id.* ¶ 84.) Plaintiff testified in his deposition that, in both cases, the students' behavior was violent and threatening towards his similarly situated colleagues and that Bashan told him that she submitted a disciplinary removal form. (Defs.' Ex. E, p. 445-53.)

### 3. Lori Saland Allegedly Commented That The New Procedures Would Be "Harder for Vinny and Randi"

Lori Saland was the Supervisor for Secondary Special Education for the School District from 1997-2008. (Defs.' 56.1 Statement ¶¶ 64-65.) On October 2, 2007, at a Special Education Department meeting, Saland discussed a new district-wide set of procedures for evaluating teachers and lesson plan techniques that would require teachers to complete a new set of paperwork. (*Id.* ¶¶ 70-72.) Saland stated, "It's going to be harder for Vinny [plaintiff] and Randi than the others." (*Id.* ¶ 75.) Randi refers to Randi Kohanim, a female teacher. (*Id.* ¶ 76.) Kohanim and plaintiff were the most senior people in the department. (*Id.* ¶ 81.) However, although plaintiff has since admitted that the comment was also directed to Randi, plaintiff alleged in his complaint that the statement was: "I'm sure most of you will have no problem with it. It's going to be harder for Vinny (plaintiff) than others." (*Id.* ¶ 77; Pl.'s 56.1 Counter Statement ¶¶ 75-77.) Plaintiff never discussed the comment with Saland, nor did he tell Williams about this meeting. (Defs.' 56.1 Statement ¶¶ 83-85.)

### 4. Two Guest Speakers Made Jokes at Two Different Events

At a Special Education Department workshop meeting on October 11, 2011, Judy Dodge ("Dodge"), who is not an employee of the School District[3] presented

---

[3] Plaintiff states in Paragraph 94 of his 56.1 Counter Statement that he did not know if Judy Dodge was employed by the District in her role as a guest speaker.

as a guest speaker. (*Id.* ¶¶ 86, 88-90, 94.) Williams was not present at the meeting and the defendants contend that Williams had no role in hiring Dodge as a guest speaker, and did not know that Dodge might make a joke about menopause. (*Id.* ¶¶ 94-96.)[4] Dodge had no reason to know who plaintiff was. (*Id.* ¶ 93.)

During the presentation, Dodge sought a topic to use as an example and stated, without particularly identifying plaintiff, "If there weren't men here, we could do it on menopause." (*Id.* ¶¶ 97-99.) Plaintiff contends that, when this statement was made, Dodge looked directly at him. (Pl.'s 56.1 Counter Statement ¶¶ 98-99.) He also believes that he was likely the only man in the audience. (*Id.* ¶ 98.) Plaintiff never complained about Dodge's joke to Williams. (Defs.' 56.1 Statement ¶ 104.)

On November 6, 2007, plaintiff attended "Superintendents Conference Day." (*Id.* ¶ 106.) Superintendents Conference Day is a meeting with all of the teachers in the District. (*Id.* ¶ 107.) The teachers are then broken down into smaller sessions. (*Id.* ¶ 107.) Guest Speaker Melinda Baird ("Baird") spoke during one of the Special Education sessions. (*Id.* ¶¶ 108-110.) The Special Education teachers from Berner Middle School, Massapequa High School Main Campus, and Massapequa High School Ames campus were present at the session. (*Id.* ¶ 112.)

During the session, Baird made a joke which, in sum and substance, was "a man goes into a store to buy a bra for his wife, and the clerk suggests that he buy a Special Ed. bra because it rounds them up and keeps them in." (*Id.* ¶¶ 114-15.) Plaintiff believes that the comment was made to an audience in which he was the only male, or one of the only males, in the audience. (Pl.'s 56.1 Counter Statement ¶ 115.) Although Plaintiff understood that the statement was a joke, plaintiff contends that he felt discriminated against based on his gender because a male speaker would not have been allowed to reference the male or female anatomy without "getting called on it." (*Id.* ¶ 115-16.) However, plaintiff would feel discriminated against whether the joke had been made by a man or woman. (Defs.' 56.1 Statement ¶ 121.)

Defendants assert that Williams had no involvement in securing Baird as a speaker and that she did not know Baird would make a joke.[5] (*Id.* ¶¶ 117-18.) Plaintiff never complained about Baird's joke to Williams. (*Id.* ¶ 119.)

### 5. Student Observer Kristopher Schmidt Was Assigned to Observe Multiple Teachers

A student observer is a college student majoring in education who needs observation hours in a classroom. (*Id.* ¶ 123.) A student does not get to choose which classrooms he observes and, for a teacher, having a student observer is voluntary. (*Id.* ¶¶ 124, 129.) For a teacher,

---

[4] Plaintiff does not admit that Williams had no role in employing Dodge as a guest speaker because he has no knowledge of Williams' role, if any, in engaging Dodge. (Pl.'s 56.1 Counter Statement ¶ 95.) He also states that he denies knowing "the extent of Williams' knowledge on Dodge's speaking style or patterns." (*Id.* ¶ 96.)

[5] Plaintiff admitted in part and denied in part these statements because he did not know what Williams' role was in selecting the speakers and cannot "speak to her intentions." (Pl.'s 56.1 Counter Statement ¶¶ 117-18.)

having a student observer is additional work, because the teacher has the additional responsibility of educating a student observer. (*Id*. ¶ 127.)

One of Saland's responsibilities was to assign student observers to particular classrooms. (*Id*. ¶ 130.) Plaintiff contends that, in addition to Saland, Helen St. Nicholas ("St. Nicholas"), a personal friend of plaintiff and the Dean at Massapequa High School, Main Campus who had no involvement with the Special Education Department, could also assign student observers to special education classrooms. (Pl.'s 56.1 Counter Statement ¶¶ 130, 135, 138-141.) However, defendants disagree and state that, as supervisor of her Department, Saland was solely responsible for assigning student observers to teachers in her Department. (Defs.' 56.1 Statement, ¶ 135, 143.)

In order to have a student observer assigned to a classroom, a procedure was put in place. (*Id*. ¶ 131.) First, a student observer would register with Nina Zash ("Zash"), the Superintendent's secretary. (*Id*. ¶ 132.) Once approved, the department chairs sent out e-mails to teachers asking for volunteers.[6] (*Id*. ¶ 132.) The defendants contend that, once Saland contacted the teachers in her Department, she would assign the student observer to different programs and different teachers so that the observer would have the most exposure to a variety of programs and teaching styles. (*Id*. ¶ 136.) Plaintiff admits that Saland would contact the teachers in the Department in regards to student observers, but denies that a student observer would typically be assigned to more than one classroom. (Pl.'s 56.1 Counter Statement ¶ 135.)

In 2008, St. Nicholas requested that Kristopher Schmidt be assigned to observe plaintiff. (Defs.' 56.1 Statement ¶ 137.) In a memorandum dated December 5, 2007, Zash advised St. Nicholas that the student had advised her that St. Nicholas had pre-approved his observation hours and identified Valenti as the teacher assigned. (*Id*. ¶ 144.) Defendants allege that the memorandum left blanks for additional assignments, while plaintiff states that St. Nicholas told him that only Valenti was approved to work with the student observer. (*Id*. ¶ 145; Pl.'s 56.1 Counter Statement ¶145.) Valenti was informed that Kristopher Schmidt was assigned to his class on January 14, 2008. (Defs.' 56.1 Statement ¶ 152.) Valenti contends that he was informed that the student observer was assigned to all of his classes. (Pl.'s 56.1 Counter Statement ¶ 152.)

Saland made the decision to change Kristopher Schmidt's assignment so that he would be able to observe a variety of classrooms and obtain a better educational experience. (Defs.' 56.1 Statement ¶¶ 154-56.) In addition to being assigned to plaintiff, Kristopher Schmidt was assigned to teachers who taught Math, Social Studies, and Science. (*Id*. ¶ 159.) Valenti contends that he also taught Math, Social Studies and Science in his Resource Room Class. (Pl.'s 56.1 Counter Statement ¶ 159.) Valenti argues that the decision to remove the student from some of his classes was gender discrimination and retaliation for engagement in a protected activity. (Pl.'s 56.1 Counter Statement ¶¶ 154-56.) Defendants contend that Schmidt continued

---

[6] Plaintiff agrees with this statement, but states that student-observers do not typically rotate among different teachers. (Pl.'s 56.1 Counter Statement ¶ 133.)

to observe plaintiff's period 2 English class and period 4 Resource Room.[7] (*Id.* ¶ 166.)

### 6. Lori Saland Allegedly Asked Plaintiff to Submit Student Recommendations by Email

As supervisor of Secondary Special Education, part of Saland's responsibilities was to run the annual review process for Special Education students. (Defs.' 56.1 Statement ¶¶ 179-80.) As part of the annual review process, teachers were required to submit a student recommendation for each of their students. (*Id.* 182-83.) Student recommendations are recommendations for the students' placement for the following year. (*Id.* ¶ 182.)

Defendants contend that it was Saland's practice to have teachers submit student recommendations by e-mail and, when a teacher submitted a paper student recommendation, she would request that it be resubmitted by email as an attachment. (*Id.* ¶¶ 185-86, 193.) Plaintiff disagrees and states that Saland originally allowed recommendations to be submitted either on paper or in electronic form but "changed the game plan" and required all student evaluations to be submitted by email after plaintiff already submitted the forms on paper. (Pl.'s 56.1 Counter Statement ¶¶ 185-86.) Plaintiff believes that this was done to harass and badger plaintiff. (*Id.* ¶ 193.)

One or two weeks prior to February 11, 2008, plaintiff placed handwritten student recommendations in Saland's mailbox. (Defs.' 56.1 Statement ¶¶ 187-88.) Saland then emailed plaintiff on the same day asking him to send her an electronic copy of the recommendations. (*Id.* ¶¶ 189-90.) Plaintiff does not recall whether he sent an electronic copy in response to this request. (*Id.* ¶ 191.) Plaintiff does not know if Saland asked everyone to submit recommendations as attachments to an e-mail. (*Id.* ¶ 194.)

On February 11, 2008, Saland came into his classroom and asked for plaintiff to submit electronic copies of his student recommendations. (*Id.* ¶ 198.) Plaintiff claims that Saland did not ask him, but yelled and harassed him when she entered his classroom. (Pl.'s 56.1 Counter Statement ¶ 198.) Plaintiff responded by saying, "I gave them to you already." (Defs.' 56.1 Statement ¶ 199.) Saland then stated, "Are you telling me that you're not going to give them to me?"[8] (*Id.* ¶ 200.) Plaintiff claims that he responded, "I'm not telling you that at all. I'm telling you that I gave them to you and they are in your mailbox." (*Id.* ¶ 201.) Saland then reiterated that she wanted the recommendations in email form.[9] (Id. ¶ 202.) On February 12, 2008, plaintiff emailed Saland an electronic copy of the student recommendations. (*Id.* ¶ 204.)

---

[7] Plaintiff cannot recall whether this is an accurate statement. (Pl.'s 56.1 Counter Statement ¶ 167.)

[8] Plaintiff admits and denies this statement because "Plaintiff denies that Saland merely asked Plaintiff for the recommendations." (Pl.'s 56.1 Counter Statement ¶ 200.)

[9] Plaintiff admits and denies this statement because he alleges that Saland did more than "reiterate" her request, but rather went on a tirade in front of a teaching assistant. (Pl.'s 56.1 Counter Statement ¶ 202.)

### 7. Lori Saland Allegedly Scheduled Plaintiff's Annual Reviews Too Close Together and Then Rescheduled Them at Plaintiff's Request

As stated above, teachers in the Special Education Department are required to submit a recommendation for each of their students during the annual review process. (*Id.* ¶ 207.) In order to complete the hundreds of annual reviews that had to be completed before the end of the year, teacher reviews were scheduled for February, March, April and May. (*Id.* ¶¶ 208-09.)

In 2008, Plaintiff was scheduled to conduct annual reviews for 15 of his students. (*Id.* ¶ 211.) Saland prepared the schedule for the reviews. (*Id.* ¶ 212.) Saland's initial schedule would require plaintiff to complete his annual review process in early March 2008 with seven days between his assigned days. (Pl.'s 56.1 Statement ¶ 175.) On Monday, February 11, 2008, plaintiff wrote an e-mail to Saland complaining that his annual review dates were too early and requested that Saland reschedule his dates later. (Defs.' 56.1 Statement ¶¶ 214-15.) That morning, Saland rescheduled the dates for the review to March 14, 2008 and March 28, 2008. (*Id.* ¶¶ 216-17.)

### B. Procedural History

On March 10, 2009, plaintiff filed the instant action, which was assigned to the Honorable Sandra J. Feuerstein. On April 30, 2009, this matter was reassigned to the undersigned. Defendants moved to dismiss the complaint on May 11, 2009. The matter was fully submitted and oral argument was held. On February 5, 2010, this Court granted the motion in part and denied the motion in part. As discussed above, this Court dismissed the Title VII claim against Williams and the Section 1983 claim against Williams in her official capacity, but denied the motion to dismiss the remaining claims. Defendants moved for summary judgment on the remaining causes of action, and the motion was fully briefed by September 12, 2011. Oral argument was held on November 4, 2011. For the reasons set forth below, the defendants' motion for summary judgment is granted in its entirety.

### II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that

party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).

III. DISCUSSION

A. Valenti's Title VII Claim Against The School District And Human Rights Law Claims Against The Defendants

1. Applicable Law

Title VII prohibits discrimination against an employee based on his gender.[10] *See* 42 U.S.C. § 2000e-2(a). Here, plaintiff claims he has been discriminated against by defendant on the basis of his gender.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000); *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected class (2) who performed his job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation).

---

[10] In addition to alleging claims under Title VII, plaintiff alleges discrimination under New York State Human Rights Law. Claims of discrimination brought under New York state law are analyzed using the same framework as claims brought under Title VII, and the outcome under state law will be the same as the outcome under Title VII. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714-15 (2d Cir. 1996).

*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 802 n.13 (1973) (noting that elements of prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his prima facie case as well as additional

evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

2. No Evidence to Support an Adverse Employment Action

A plaintiff suffers an adverse employment action when he experiences a "materially adverse change in the terms and conditions of employment." *Richardson v. N.Y. State Dep't of Corr. Servcs.*, 180 F.3d 426, 446 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry.*

*Co. v. White*, 548 U.S. 53, 57 (2006), (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). Typical adverse employment actions may include termination from a job, decrease in salary, material reduction in benefits or responsibilities, or a less distinguished title. *See Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Changes in assignments or duties that do not "radical[ly] change" the nature of work are not typically adverse employment actions. *See Galabya*, 202 F.3d at 640 (quoting *Rodriguez v. Bd. of Ed.*, 620 F.2d 362, 366 (2d Cir. 1980)).

Although the burden of establishing a prima facie case is minimal, plaintiff has failed to put forth evidence that would allow a rational factfinder to conclude that plaintiff was subjected to an adverse employment action. In other words, even if plaintiff's version of the evidence is credited, he has failed to point to any conduct that could constitute an adverse employment action as a matter of law that would support a claim for gender discrimination.

In particular, plaintiff alleges the following six[11] "adverse employment"

---

[11] In Plaintiff's Opposition to Defendants' Motion for Summary Judgment and in his 56.1 Statement of Undisputed Facts, Plaintiff articulates the following allegations: (1) Williams looked into Plaintiff's classroom; (2) at special education meetings Saland stated that plaintiff should have brought certain paperwork; (3) Williams assigned Kristen Fisher to student-teach other classes in addition to plaintiff's; (4) Williams directed plaintiff to shorten his exam; (5) plaintiff taught three periods in a row and then had bus duty; (6) in June 2010 plaintiff was assigned seven final exam proctoring assignments; (7) in May 2010, plaintiff was assigned four resource room classes; and (8) in November 2009, plaintiff was not offered a "removal form" after a student pushed

actions by the defendants: (1) no formal investigation was conducted after a student's parent informed the School District that her daughter did not feel comfortable when Valenti touched her shoulder; (2) Saland commented that the new procedures would be harder for Vinny; (3) two guest speakers made jokes about menopause and a bra; (4) a student observer was assigned to observe several different teachers; (5) Saland required that student recommendations be submitted by email; and (6) Saland scheduled plaintiff's reviews at an earlier time and then rescheduled them at plaintiff's request.

Viewing the evidence in a light most favorable to plaintiff, the Court concludes, as a matter of law, that plaintiff has failed to show that any of these acts by the defendants were "adverse employment actions" for purposes of a gender discrimination claim.

---

plaintiff and shouted at him. (Pl.'s Mem. in Opp. at 6-8; Pl.'s 56.1 Statement ¶¶ 126-136, 105, 188-190, 181-186, 192, 193-194, 195, 198-99.) As a threshold matter, new theories of liability should not be asserted for the first time in Opposition to Defendants' Motion for Summary Judgment. *See Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010) ("[a]s a threshold matter, courts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment"); *Sea Tow Services Intern v. Pontin*, 607 F. Supp. 2d 378, n.9 (E.D.N.Y. 2009) (court does not consider new events that allegedly occurred after the complaint was filed). In any event, the Court has also fully considered these allegations and concludes that none of them would rise to the level of an adverse employment action for purposes of a gender discrimination claim.

a. Meeting with Valenti Regarding Student's Allegation of Inappropriate Touching

Valenti's claim regarding the meeting to discuss a student's accusation that Valenti touched a student inappropriately cannot provide the basis for an adverse employment action given the uncontroverted facts in the record. In any event, there is no evidence from which a rational jury could conclude that the defendants' handling of that situation was motivated by gender discrimination.

With respect to the lack of an adverse employment action, it is uncontroverted that plaintiff was accused of no wrongdoing and was not disciplined. The mere fact that Valenti felt that the meeting with Williams and Nordam was disciplinary does not make the action an adverse employment action. "[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." *Castro v. New York City Bd. of Educ. Personnel*, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998). Thus, even if Valenti were reprimanded (which he was not), it would not amount to an adverse employment action. The fact that Valenti felt discomfort and feared repercussions is not enough to allege gender discrimination when no actual disciplinary action was taken against him.

The only disciplinary action that Valenti claims occurred was that he was subjected to increased supervision after his meeting with Williams and Norden. An increase in supervision without more is not grounds for a discrimination claim. For a claim of "increased supervision" to be actionable, it

must be accompanied by "unfavorable consequences." *Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003); *see also Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001). Here, apart from the alleged increased supervision, there was no unfavorable consequence following the meeting. Therefore, the failure of the school to conduct a formal investigation into the claim that Valenti inappropriately touched a student and the alleged increased supervision after his meeting with Williams and Norden are not adverse employment actions as a matter of law.

Similarly, even if plaintiff could establish an adverse employment action, there is no evidence that would give rise to even an inference of gender discrimination. Valenti's argument that he was discriminated against because no formal investigation was conducted after the parent reported the "touching," and because the student was not disciplined for a false accusation, is pure speculation, and has no factual support in the record. Plaintiff has failed to point to any other employee who was accused of similar conduct that led to a formal investigation. *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (stating that to be "similarly situated" for Title VII purposes, plaintiff must establish "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's case, rather than a showing that both cases are identical," and their acts must be "of comparable seriousness"); *see also Butts v. N.Y. City Dep't of Hous. Pres.*, No. 00 Civ. 6307 (KMK), 2007 WL 259937, at *10 (S.D.N.Y. Jan. 29, 2007) (granting summary judgment where plaintiff offered only "general and speculative allegations" that plaintiff was "treated differently than similarly situated employees not of Plaintiff's protected class").

Plaintiff does point to two situations with special education teachers Bashan and Doherty. However, these situations are distinctly different from the plaintiff's case. In both Bashan and Doherty's situations, a student was verbally abusive towards the teacher and made violent and threatening remarks. In Valenti's case, there is no allegation of a threat of violence. Additionally, unlike Valenti, Bashan completed a disciplinary removal form, while Valenti never requested that the student be removed from his class during his meeting with Williams or at any time after the meeting. Thus, there is not a "reasonably close resemblance" between Valenti's situation and Bashan or Doherty's situations.

It should also be noted that Valenti's reliance on the Code of Conduct as a basis for his belief that a formal investigation was required in his situation is entirely misplaced. The page Valenti cites to in the Code of Conduct clearly indicates that disciplinary action is discretionary. The Code of Conduct states that students who violate certain provisions of the code "*may* be subject to disciplinary action, up to and including suspension from school." (Pl.'s Ex. 14, p. 10 (emphasis added).) Moreover, plaintiff fails to point to a single section of the Code of Conduct that states that a formal procedure must be conducted if a student makes an allegation, especially as here where it is uncontroverted that the parent was not claiming any allegation of improper touching. Thus, there is no basis for Valenti's contention that the Code of Conduct provides that a formal investigation must be made into the student's allegation in this particular situation, or that a student

must be disciplined under these circumstances.

In sum, even construing the evidence most favorably to plaintiff, there is no factual basis from which a rational jury could conclude that the defendants' handling of this incident constituted an adverse employment action or was motivated by gender.

### b. Saland's Comment that the New Procedures Would Be Harder for "Vinny"

The alleged comment by Saland that the new procedures would be harder for plaintiff is also not actionable as an adverse employment action. In other words, plaintiff has failed to point to any material alteration in his conditions of employment that resulted from this comment.

In any event, given that plaintiff has now acknowledged that the comment was also directed at a female teacher, it is hard to understand how anyone could conclude that it is evidence of gender discrimination. In particular, Valenti originally claimed in his complaint that Saland's statement was: "I'm sure most of you will have no problem with it. It's going to [be] harder for Vinny than others." (Complaint ¶ 30.) Valenti claimed that, by making this comment, Saland treated plaintiff differently than his similarly situated female colleagues by humiliating him and referencing his gender. However, Valenti has since admitted that he incorrectly quoted Saland in his complaint. Valenti agrees with the defendants that the statement actually referenced both Valenti and Randi Kohanim, a female teacher in his department. Although Valenti acknowledges this contradiction, he fails to address how this significant change in the statement made can still support a claim of gender discrimination even if it was part of some adverse employment action (which is lacking in this case). Therefore, Saland's comment, as a matter of law, is not an adverse employment action.

### c. Two Guest Speakers Made Jokes About Menopause and a Bra

Valenti's third contention is that the School District and Williams permitted two guest speakers to make gender-related jokes that humiliated plaintiff. Even if true, this claim fails to constitute an adverse employment action for purposes of a gender discrimination claim.

Even if Valenti is correct that a guest speaker was looking directly at him when she made her joke, or that he was one of only a few men in the room, if not the only man, the fact that jokes were made and that Valenti was uncomfortable is not a sufficient basis to properly allege an adverse employment action for a gender discrimination claim. Valenti has only alleged that he felt humiliated when the jokes were made which is not an adverse employment action. Thus, plaintiff has not made any allegation that he suffered a "materially adverse change in the terms and conditions of his employment" by attending the meetings where the jokes were made. *See Richardson*, 180 F.3d at 446 (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). Thus, the fact that two guest speakers made jokes at two meetings that plaintiff attended is not, as a matter of law, an adverse employment action.[12]

---

[12] Plaintiff has not alleged a hostile work environment claim. However, even if he did, these isolated incidents, even if they took place, could not

15

#### d. A Student Observer Was Assigned To Observe Several Different Teachers

Additionally, Valenti's claim that a student observer was assigned to observe teachers other than Valenti is not an adverse employment action as a matter of law.

Not receiving a requested or desired assignment is not an adverse employment action. *See Bright v. LeMoyne College*, 306 F. Supp. 2d 244, 254 (N.D.N.Y. 2004) (holding that being given a different shift than the one requested is not an adverse employment action); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (concluding that listing a name wrong in the school directory, having difficulty obtaining a parking permit, not being named a department chair, and not being assigned to teach summer courses not adverse.) Here, although Valenti himself was not being assigned to a class, this situation is analogous to a situation where Valenti would be seeking a desired assignment. Although Valenti may have wanted the student observer to be assigned to all of his classes, despite the additional work he would incur, the fact that the student's assignment was changed is not an adverse employment action.

#### e. Saland's Request That Student Recommendations be Submitted in Email Form

Plaintiff's contention that he suffered an adverse employment action by having to submit his student recommendations as an email attachment is similarly unavailing.

As a matter of law, an employee who is required to do what every other similarly situated employee is required to do does not suffer an "adverse employment" action. *See Richardson*, 180 F.3d at 466. "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Galabya*, 202 F.3d at 640 (quoting *Crady*, 993 F.2d at 136). Even if Valenti was inconvenienced by Saland's requests that the evaluations be submitted in email form, it is still not enough to make that request a "materially adverse" employment action. *See id.* at 641 (holding that to be an adverse employment action, the assignment must "constitute a setback to the plaintiff's career"). "[S]ubjective dissatisfaction with assignments does not constitute adverse employment action." *Harrison v. N.Y. City Off-Track Betting Corp.*, No. 99 Civ. 6075(VM), 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); *see also Castro v. N.Y. City Bd. of Educ.*, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (holding that "not everything that makes an employee unhappy is an actionable adverse action"); *see also Brown v. Snow*, No. 02 Civ. 7985(GEL), 2006 WL 623594, at *5 (S.D.N.Y. Mar. 13, 2006). Certainly there are situations where additional duties or alterations in responsibilities *could* qualify as adverse employment actions, but the action must result in a "materially significant disadvantage" to the employee. *Galabya*, 202 F.3d at 641; *see also Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (reassignment to job with "undesirable shifts" and "erratic schedule" could be an adverse employment action).

Here, plaintiff cannot point to any "materially adverse" change to his career, position, salary, benefits, or overall position

---

provide a basis for such a claim under the circumstances of this case.

as a result of being asked to submit his evaluations to Saland by email. Regardless of whether or not Saland originally allowed evaluations to be submitted in paper or email form, the decision to only accept email evaluations not only affected Valenti but all employees, including his similarly situated female colleagues. Thus, Valenti may have been inconvenienced when he was told he had to submit his student evaluations in email form, but the request was not an adverse employment action.

Additionally, Valenti claims that when Saland came to his room to request the student evaluations, he felt harassed and believed he was being subjected to increased supervision. This is also not an adverse employment action, nor is there any basis to conclude it was motivated by gender discrimination.

As stated *supra*, for a claim of "increased supervision" to be actionable, it must be accompanied by "unfavorable consequences." *Scafidi*, 295 F. Supp. 2d at 239; *see also Bennett*, 136 F. Supp. 2d at 248. In this case, plaintiff has only pointed to this one isolated incident. Furthermore, Valenti failed to even allege, much less submit admissible evidence, that he suffered any "unfavorable consequences" from the "increased supervision." Thus, given the evidence this case, no rational jury could conclude that plaintiff suffered an adverse employment action.

f. Saland Scheduled Plaintiff's Reviews for March and Then Rescheduled the Reviews upon Plaintiff's Request

Valenti claims that although his reviews were rescheduled, the mere fact that his reviews were initially scheduled earlier indicates that he was being treated differently from his similarly situated female colleagues. This claim is without merit, and cannot constitute a basis for gender discrimination.

Plaintiff admits that in order to complete all of the reviews, reviews were conducted from February through April. Thus, although Plaintiff contends that he was treated differently than his similarly situated female colleagues by being assigned a date in March, it necessarily follows that some teachers may have, and quite possibly were, scheduled to complete their reviews earlier than Valenti. As stated *supra*, "[t]o be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Galabya*, 202 F.3d at 640 (quoting *Crady*, 993 F.2d at 136). Thus, merely being inconvenienced by being assigned an earlier date to complete his reviews does not amount to an adverse employment action.

It should also be noted that plaintiff was not even inconvenienced by his assignment. As soon as Valenti requested that the dates of his reviews be changed Saland accommodated his request. Thus, the initial scheduling was not a materially adverse change in his employment.

In sum, even construing the evidence most favorably to plaintiff, no rational jury could conclude that any of the alleged acts constituted an adverse employment action for purposes of gender discrimination, or that they occurred under circumstances giving rise to an inference of gender discrimination. Thus, plaintiff's gender discrimination cannot survive summary judgment.

### B. Valenti's Retaliation Claim

Plaintiff also has asserted a retaliation claim. Specifically, plaintiff contends "a reasonable jury could conclude that defendants' inactions and failure to relay relevant information to plaintiff on the student-touching allegations, despite clear prohibitions against false accusations in the Code of Conduct and the policy mandate to promptly and fairly resolve cases, caused plaintiff to work in fear and changed the terms and conditions of his employment." (Pl.'s Mem. in Opp. at 18.) Plaintiff asserts that "[a] reasonable jury could conclude that these actions and inactions would dissuade a reasonable worker from filing suits in the Eastern District of New York against defendant District, as plaintiff had done previously." (*Id.*)

As set forth below, the Court disagrees with plaintiff and concludes that, even accepting plaintiff's evidence as true and drawing all reasonable inferences in plaintiff's favor, no rational jury could conclude that plaintiff was the victim of retaliation. Accordingly, summary judgment is warranted on the retaliation claim.

### 1. Applicable Law

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in a protected activity; (2) defendant was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the

adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). An employment action is considered adverse if "the employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

A claim of retaliation is analyzed under the three-step burden-shifting analysis laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See also Terry*, 336 F.3d at 141. Under this framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry*, 336 F.3d at 140-41 (internal citations omitted).

As noted above, it is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986)); *De Cintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 116 n.8 (2d Cir. 1987). Likewise, if the employer was at all

motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action. *Sumner*, 899 F.23d at 209. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *Id.*

Moreover, in addition to relying on discrete employment actions to prove retaliation, a plaintiff can also try to prove that a retaliatory hostile work environment existed. In order to establish a retaliatory hostile work environment, a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct. *See, e.g.*, *Rasco v. BT Radianz*, No. 05 Civ. 7147 (BSJ), 2009 WL 690986, at *15 (S.D.N.Y. Mar. 17, 2009) ("To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his employment."); *Faison v. Leonard St., LLC*, No. 08 Civ. 2192 (PKC), 2009 WL 636724, at *4 (S.D.N.Y. Mar. 9, 2009) (same); *McWhite v. New York City Hous. Auth.*, No. CV 0991(NG)(LB), 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008); *see also Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) ("An allegedly retaliatory act must rise to some level of substantiality before it can be actionable. The hostile work environment doctrine, as developed in the anti-discrimination jurisprudence of Title VII, embodies that prerequisite." (citation

omitted)); *Rigau v. Pfizer Caribbean Corp.*, 525 F. Supp. 2d 272, 287 (D.P.R. 2007) (same).

Thus, a plaintiff must demonstrate that his workplace is "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004); *see also Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53; *Terry*, 336 F.3d at 147. "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

The Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to demonstrate a hostile work environment. See *Richardson*, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley*, 217 F.3d at 154 (citing *Harris*, 510 U.S. at 23); *see also Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

## 2. Application[13]

Although the standard for an adverse action for retaliation purposes is broader than for purposes of a gender discrimination claim, plaintiff has failed to set forth any actions from which a rational jury could conclude that he was the victim of retaliation.

First, as discussed *supra*, the incidents enumerated by plaintiff are mundane workplace issues or inconveniences. His claims include, *inter alia*, Williams looking into his classroom, having eight minutes of bus duty, having to send a document by email (rather than paper), and many other regular interactions between a worker and his or her supervisor. Even if plaintiff could prove that the incidents took place and were retaliatory, no rational jury could conclude that these acts would dissuade a reasonable worker from making or supporting a charge of discrimination. Similarly, even collectively, these incidents could not support a rational finding by a jury of a retaliatory hostile work environment. As the Second Circuit has emphasized, "[r]etaliation laws are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled." *Ruggieri*, 146 F. Supp. 2d at 218. Thus, none of plaintiff's allegations, either individually or collectively, could support a finding by a rational jury of an adverse action for purposes of a retaliation claim.

Second, even construing the evidence most favorably to plaintiff, no rational jury could find a causal connection between protected activity and any of the allegedly adverse acts. For example, the "student touching" incident, and the defendants' handling of it, occurred more than one year after plaintiff's lawsuit was dismissed in September 2006. Similarly, although plaintiff contends that defendants continued to refuse to resolve the incident after he filed his claim in November 2007, the incident ended in September 2007 and plaintiff never spoke again to the administration about it. In short, there is no evidence from which a jury could find causation in connection with plaintiff's retaliation claim. Accordingly, plaintiff's retaliation claim cannot survive summary judgment.

## C. Valenti's Section 1983 Claim

Plaintiff also asserts a cause of action under Section 1983 based upon the alleged discriminatory conduct by the defendants. As set forth below, this claim also cannot survive summary judgment and must be dismissed.

Under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges or immunities secured by the Constitution and federal law, (2) by a person acting under the color of state law.[14] 42

---

[13] As a threshold matter, for purposes of the summary judgment motion, defendants do not contest that plaintiff participated in protected activity and defendants had knowledge of such activity. Thus, the Court focuses on the remaining two elements.

[14] Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). "'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action,' such as a claim for denial of equal protection, 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994) and citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993)).

Plaintiff asserts violations of his rights under the Equal Protection Clause of the Fourteenth Amendment[15], which provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a claim of discrimination under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his membership in a protected class. *See Linder v. City of N.Y.*, 263 F. Supp. 2d 585, 592 (E.D.N.Y. 2003) (citing *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)).

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *Latrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). To prevail on this claim, plaintiff must show that (1) he was treated differently from similarly situated individuals; and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499(2d Cir. 2001)).

For the reasons discussed *supra* in connection with this gender discrimination claim, plaintiff has failed to set forth evidence that he was treated differently from similarly situated individuals, on the basis of his membership in a protected class. In short, no rational jury could conclude that he was treated differently from similarly situated female teachers in connection with any of the alleged incidents asserted by plaintiff. Therefore, summary judgment on plaintiff's Section 1983 claim against the School District and Williams is warranted. [16]

---

Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[15] Plaintiff's complaint and brief in opposition to the motion for summary judgment do not explicitly assert a violation of the Equal Protection Clause of the Fourteenth Amendment. However, based on the claims set forth in the complaint, the court assumes that the plaintiff's basis for his Section 1983 claim is the Equal Protection Clause of the Fourteenth Amendment.

[16] Because the Court has found that plaintiff's Section 1983 claims cannot survive summary judgment, the Court need not reach defendants argument that Williams is entitled to qualified immunity.

## D. Valenti's State Law Discrimination Claims[17]

"New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII, [and the Court] analyze[s] these claims in tandem. *Leopold v. Baccarat*, 174 F.3d 261, 264 n.1 (2d Cir. 1999); *see also Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 535-36 (E.D.N.Y. 2005) ("Discrimination and retaliation claims under the NYSHRL are analyzed identically to claims under . . . Title VII and the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." (internal quotation marks and citation omitted)). The Court exercises supplemental jurisdiction over plaintiff's state claims because the same standard is applicable and, thus, judicial economy warrants consideration of these claims. As to the state claims, for the same reasons the Court found that the federal claims for gender discrimination and retaliation cannot survive summary judgment, the Court concludes that defendants are entitled to summary judgment on the state discrimination claims.[18]

## E. Defendants' Motion for Attorneys' Fees

Defendants contend that they are entitled to attorneys' fees on their motion for summary judgment, pursuant to Title VII and 42 U.S.C. § 1988. In particular, defendants argue that such fees are proper because plaintiff's lawsuit was "'frivolous, unreasonable, or groundless, or that plaintiff continued litigation after it clearly became so.'" (Defs.' Mem. of Law at 24 (quoting *Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir. 1984)). For the reasons that follow, although it is a close question, defendants' motion for attorneys' fees is denied.

42 U.S.C. § 1988(b) provides that:

In any action or proceeding to enforce a provision of sections 1981,

---

[17] As a threshold matter, defendants argue that the Court lacks subject matter over certain incidents in the complaint because they were not specifically identified in the Notice of Claim. However, the Court concludes that the Notice of Claim requirement is satisfied with respect to the alleged conduct in the complaint because they all arise from the same theories of liability that are mentioned in the Notice of Claim – namely gender discrimination and retaliation. In addition, defendants argue that the state law claims against the School District are governed by the one-year statute of limitations set forth in Education Law § 3813, and are time barred. Plaintiff counters that the claims are timely filed because his charge of discrimination with the EEOC, which tolled the limitations period. However, the Court need not decide this issue because it concludes, as discussed *infra*, that the state law claims cannot survive summary judgment even if they are timely.

[18] In addition, plaintiff asserts New York Human Rights Law claims against the individual defendant. Under the NYSHRL standard for aiding and abetting liability, "there is . . . a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *See Drummond*, 400 F. Supp. 2d at 536 (holding that plaintiff's failure to establish a NYSHRL claim against employer requires dismissal of claims against individual employees for aiding and abetting); *see also DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y.1999) (supervisor who committed sexual harassment not held liable under § 296(6) because plaintiff could not state a claim of sexual harassment against the employer); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490-91 (S.D.N.Y.1999) (holding that plaintiff failed to establish liability against individual defendant's employer thereby eliminating her claims against the individual defendant as an aider and abettor under the NYSHRL). Because plaintiff has failed to establish the employer's liability, plaintiff's claims against the individual defendant also are dismissed.

1981a, 1982, 1983, 1985, and 1986 of this title . . . title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

42 U.S.C.A. § 1988(b). However, if the prevailing party is the defendant, attorneys' fees will only be awarded if the plaintiff's claim was "'frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'" *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (quoting *Hughes v. Roe*, 449 U.S. 5, 15 (1980) (per curiam)); *see also Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994) (citations omitted). The defendant does not need to prove bad faith, but proving so will support an award of attorneys' fees. *Rounseville*, 13 F.3d at 632 (citing *Davidson v. Keenan*, 740 F.2d 129, 133 (2d Cir. 1984)).

The Court has no reason to believe that plaintiff knew at the time the lawsuit was filed that it was frivolous. For example, as noted *supra*, plaintiff appears to have believed that other similarly situated female workers were treated differently from plaintiff. Although discovery produced absolutely no evidence to support plaintiff's belief that such similarly situated employees existed, there is insufficient basis to conclude that plaintiff's erroneous assertion was made in bad faith. *See, e.g.*, *Nesmith v.*

*Martin Marietta Aerospace*, 833 F.2d 1489, 1491 (11th Cir. 1987) (in finding Rule 11 sanctions unwarranted, court noted, "[t]he evidence [plaintiff] presented not only failed to indicate discriminatory treatment, but instead revealed that [plaintiff] received several salary increases and promotions during his tenure. [Plaintiff] made no showing that other similarly situated members of the unprotected class were treated preferentially nor did he present evidence of retaliation. Under these circumstances, it is apparent that [plaintiff's] claim may be characterized as without foundation, but there is no evidence that he was in bad faith in bringing the claim, or that it was brought for any purpose other than to receive what he thought he was entitled to under the law."); *Grant v. Pfizer, Inc.*, 683 F. Supp. 41, 45 (S.D.N.Y. 1988) ("While plaintiff did not succeed in coming forward with the evidence necessary to survive defendant's motion for summary judgment, her attorney's expectation that discovery would produce such evidence was neither unreasonable nor vexatious.").[19] Thus, this Court finds that there is no basis to conclude that the lawsuit was filed in bad faith or was frivolous.

Similarly, although plaintiff opposed the summary judgment motion even after discovery produced no evidence to support plaintiff's discrimination claims, the Court

---

[19] This Court recognizes that this motion is brought under Section 1988, rather than Rule 11. However, the Court believes that the Rule 11 cases provide helpful guidance on the Court's consideration of this issue under Section 1988. *See, e.g.*, *Banks v. Prudential California Realty*, 15 F.3d 1082, 1994 WL 6572, at *5 (9th Cir. 1994) ("This court has held that the Rule 11 standard is identical to the standard used to determine whether or not a prevailing civil rights defendant is entitled to attorneys' fees.") (citation omitted).

does not find such opposition to warrant an award of attorneys' fees. In the opposition, plaintiff cited the legal standard and attempted to raise disputed factual issues regarding his underlying conduct at the plaintiff's job. Although the Court determined that any such disputed issues were not material given the undisputed evidence regarding the actions of defendants, the Court does not view plaintiff's opposition to have been submitted in bad faith or to otherwise warrant the award of fees. In essence, the Court concludes that plaintiff genuinely believed that these workplace incidents individually or cumulatively rose to the level of an adverse action, and further believed that discovery would prove that the defendants' actions were motivated by gender or retaliation. Although plaintiff was incorrect in his legal and factual beliefs, his erroneous assumptions do not rise to the level to warrant an award of attorneys' fees against him under Section 1988.

In short, even though the basis for this lawsuit was extremely thin and the unsuccessful opposition to the summary judgment motion was very weak, the Court does not believe attorneys' fees are warranted under the particular circumstances of this case. *See, e.g.*, *Mareno v. Rowe*, 910 F.2d 1043 (2d Cir. 1990) ("The positions advanced by [plaintiff] and his attorney, however faulty, were not so untenable as a matter of law as to necessitate sanction. Nor did they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against."); *see also Scientific Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 Civ. 1851(NGG) 2007 WL 1026411, at *5 (E.D.N.Y. Mar. 30, 2007) ("The court agrees that [the defendant] has been imprudent in choosing to litigate this claim. However, Rule 11 sanctions are not

appropriate where there is a viable claim that is weak."); *Eisenberg v. Yes Clothing Co.*, No. 90 Civ. 8280(JFK), 1992 WL 36129, at *4 (S.D.N.Y. Feb. 19, 1992) ("Rule 11 sanctions are not to be imposed on every litigant that files a motion that the Court deems premature, or ill-advised, or weak."); *see generally Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978) (warning against the use of "hindsight logic" that "because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation").

Accordingly, defendants' motion for attorneys' fees under Section 1988 is denied.[20]

---

[20] However, given this Memorandum and Order, as well as the Court's September 5, 2006 Memorandum and Order (granting summary judgment to defendant School District regarding other discrimination claims related to his conduct as teacher), plaintiff unquestionably now has a full understanding of the type of actions on the part of an employer that could plausibly constitute an actionable, adverse action under the discrimination laws. Thus, the Court expects that plaintiff, prior to bringing another discrimination lawsuit against the defendants for any future conduct, will fully analyze any such claims within the context of the legal framework already set forth previously by the Court, in order to ensure that the claims are not legally frivolous.

## IV. Conclusion

For the reasons set forth herein, defendants' motion for summary judgment is granted in its entirety on all claims, and the complaint is dismissed in its entirety. Defendants' motion for attorneys' fees is denied. The Clerk of the Court shall enter judgment accordingly and close this case.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 28, 2012
Central Islip, NY

\* \* \*

Plaintiff is represented by Kyle T. Pulis, Esq., Scott M. Mishkin, Esq., and Erik McKenna, Esq., of Scott Michael Mischkin, PC, One Suffolk Square, Suite 240, Islandia, New York, 11749. Defendants are represented by Steven C. Stern, Esq., and Leo Dorfman, Esq., of the Law Offices of Sokoloff Stern LLP, 355 Post Avenue, Suite 201, Westbury, New York 11590.